(7 App. Div. 185)

PEOPLE ex rel. FALLON v. WRIGHT, Commissioner of Correction.

(Supreme Court, Appellate Division, First Department. June 29, 1896.)

1. OFFICE AND OFFICER—REMOVAL—CIVIL SERVICE LAW.
    Under Laws 1888, c. 119, providing that a veteran of the war shall not be removed from any position to which he has been appointed under the state, or any city therein, "except for cause shown after a hearing had," such veteran, in a proceeding to remove him, is entitled to cross-examine the witnesses produced to support the charges against him.

2. SAME—CAUSE FOR REMOVAL.
    Under Laws 1894, c. 716, § 1, providing that veterans of the war shall be removed from public positions to which they have been appointed "only for incompetency and conduct inconsistent with the position held by" them, a removal cannot be made except on the ground specified.

3. SAME—REVIEW ON CERTIORARI.
    The proceeding for such removal is judicial, and is therefore reviewable in certiorari.

4. SAME—VIOLATION OF RULES.
    A charge against a prison warden, of violation of rules, in admitting a visitor to the prison without first searching him, is not sufficient to sustain the removal of the warden from office, where it is shown that it had long been a custom to permit persons of a certain kind to visit prisoners without first searching them, and that the visitor in question was one of that kind.

5. SAME—DISOBEDIENCE OF ORDERS.
    A prison warden is not chargeable with disobedience of orders, where he was directed to remove a prisoner from the dark cell, in which he had been placed in solitary confinement, "and returned to his cell," and, instead of placing prisoner in the cell formerly occupied by him, placed him in another cell of the same class.

6. SAME—CRUEL AND INHUMAN TREATMENT OF PRISONERS.
    A prison warden is not guilty of cruel and inhuman treatment of prisoners, in that he kept the prisoner in solitary confinement, without food, for two days, where depriving the prisoner of food did not actually result in any harm to him, and a physician testified that in a majority of cases such deprivation is a benefit, rather than an injury.

7. SAME—EVIDENCE.

A charge against a prison warden, of depriving a prisoner of food for two days, is not established where the only direct evidence was that of a subordinate employé at the prison, who for months previous had been watching the warden for the purpose of preferring charges against him, and whose testimony was otherwise impeached, and the warden testified that his orders as to the prisoner were limited to the deprivation of meat and fish preparation for the prisoner's dinner. .

8. SAME—CAUSE OF PUNISHING PRISONER.

A prison warden is justified in punishing a prisoner who calls him foul names, and uses abusive expressions towards him.

9. SAME—RULINGS ON EVIDENCE.

On certiorari to review the wrongful dismissal of a prison warden, the order of removal will be reversed where it was based on conclusions resulting from erroneous rulings as to evidence, though in such proceedings the same correctness in ruling on questions of evidence is not required as in ordinary trials at law.

Certiorari by John J. Fallon to review the action of Robert J. Wright, as commissioner of correction of the city of New York, in removing relator from his office of warden of the city prison. Reversed.

The charges and specifications were as follows:

"(1) Violation of Rules. Specification: That on the 30th of November, 1895, you ordered a male visitor, to wit, one C. W. Mullin, residing at No. 84 State street, Brooklyn, N. Y., to be admitted, without searching, to the city prison, to visit one Walter S. Langerman, a person then confined in said prison under conviction of rape, in violation of rule 8 of the rules for visitors, to be found among the regulations for the government of said city prison, theretofore duly established, and in force on said date. ·

"(2) Disobedience of Orders and Cruel and Inhuman Treatment of Prisoners. Specification: That on Thursday, January 2, 1896, you ordered one Herman, a prisoner in said prison under indictment, to solitary confinement, and kept him without food until the afternoon of January 4, 1896, and that in disregard of an order duly given to you on the 5th day of January, 1896, you removed said prisoner from a cell formerly occupied by him, to which he had been returned by due authority."

The relator, in answer to the first charge and specification, stated that it had been the custom for upwards of 20 years to permit clergymen and other respectable, religious, and well-disposed persons to visit prisoners for the purpose of rendering them spiritual and religious advice and consolation, and that during all this period such visitors had been permitted to enter the prison and visit the prisoners without being subjected to search; that Mullin, the person named in this charge and specification, was within the description of persons who had been thus admitted to the prison, and permitted to visit the prisoners, without being searched; and that the relator permitted Mullin to visit Langerman without being searched only upon being convinced that he (Mullin) was within this description of persons. In answer to the second charge and specification he stated that Herman was ordered into solitary confinement because of misconduct and insubordination in that he had used towards the warden grossly abusive and improper language; but that Herman was not deprived of food by his (the relator's) orders, such orders being limited to the deprivation only of that portion of the prison food consisting of the meat and fish preparation for dinner. He added that this discipline was such as was usual in such cases. As to the alleged disregard of the respondent's order of January 5, 1896, the relator stated that the removal of Herman from the cell to which he had been returned to another cell was not in disregard of the order relieving this prisoner from the dark cell, but was simply a measure of prudence, to avoid the possibility of rebellious or insubordinate conduct likely to result under the circumstances from communication between Herman and the neighboring prisoners. Testimony was taken in support and in refuta-

tion of these charges. Upon this testimony the relator was found guilty of incompetency, and of conduct inconsistent with his position of warden, and he was thereupon removed from office.

Argued before VAN BRUNT, P. J., and BARRETT, RUMSEY, O'BRIEN, and INGRAHAM, JJ.

Charles J. Patterson, for relator.

William L. Turner, for respondent.

BARRETT, J. The relator is an honorably discharged soldier, who served as such in the Union army during the war of the Rebellion. His certificate of discharge informs us that his character was good, that he took part in seven important engagements, and that he served with his battery at the siege of Petersburg, Va., from the 7th of July to the 23d of August, 1864. As such veteran, the relator could be removed only for incompetency, and conduct inconsistent with his position, after a hearing had. The legislature has steadily and consistently provided for and protected veterans of the late war. In 1884 it was provided that they should be preferred for appointment in every public department and for employment upon all public works of the state. Laws 1884, c. 312. In 1886 the provision was, in grateful recognition (so reads the act) of their services, sacrifices, and sufferings, extended so as to embrace such preferences even though the veteran should be graded lower than others in civil service examinations. Laws 1886, c. 29, § 1. In 1887 it was still further extended, so as to embrace all the cities, towns, and villages of the state; and failure to comply with the legislative will, both in its letter and spirit, was made a misdemeanor. Laws 1887, c. 464. In 1888 provision was made for the permanent retention in office, during good behavior, of these honored servants. It was expressly provided that they should not be removed "except for cause shown after a hearing had." Laws 1888, c. 119. This was reaffirmed in 1890, and extended so as to cover veterans of the Mexican war and others. Laws 1890, c. 67. It was further extended in 1892. Laws 1892, c. 577. Finally, in 1894, what alone should be deemed "cause" for removal was clearly defined. The language of the act is explicit that in all such cases "the person having the power of employment or appointment, when the statute provides for a definite term, should have the power of removal only for incompetency and conduct inconsistent with the position held by the employee or appointee." Laws 1894, c. 716, § 1. The intention jealously to guard the veteran's rights in this respect is further evidenced by the unusual and striking provision that, "in case of such removal * * * for partisan, political, personal or other cause except incompetency and conduct inconsistent with the position so held, * * * such soldier * * * so wrongfully removed * * * shall have a right of action in any court of competent jurisdiction for damages as for an act wrongfully done, in addition to the existing right of mandamus; the burden of proving such incompetency and inconsistent conduct as a question of fact, shall be upon the defendant." Thus every intendment is substantially declared to be against the legality of the

removal.   The veteran, in such an action, may rest upon proof of the deprivation of his office.   The statute makes the act of deprivation prima facie illegal, and throws upon the removing official the burden of defending his act, and of convincing a jury that the veteran was incompetent, and guilty of conduct inconsistent with his position.   It is quite clear, therefore, in view of the course and spirit of legislation upon this subject, that the relator was entitled at least to a fair and impartial trial upon specific charges of incompetency and conduct inconsistent with his position.   He was equally entitled to cross-examine the witnesses produced in support of the charges, and to so cross-examine them fully, adequately, and without illegal or undue restraint.

The respondent's power, as was said in People v. Nichols, 79 N. Y. 588, was "not an arbitrary one to be exercised at pleasure, but only upon just and reasonable grounds,"—a doctrine which was quoted with approval, and reaffirmed in People v. Jones, 112 N. Y. 608, 20 N. E. 577.   A fortiori should the rules laid down in these cases be applied to the attempted removal of those public servants for whom the people, through their representatives, have evinced such tender consideration.   "The proceeding," said Judge Danforth in the Nichols Case, "must be instituted upon specific charges, sufficient in their nature to warrant the removal; and then, unless admitted, be proven to be true.   Defendant might also cross-examine the witnesses produced to· support the charge, call others in his defense, and in these and other steps in the proceeding be represented by counsel.   In no other way could the person sought to be removed have a due hearing, or an opportunity to be· heard; and this condition must be complied with before the power of removal is exercised.   *   *   *   It follows, therefore, that the proceeding is judicial in its character, and, as a necessary consequence, is subject to review by a writ of certiorari issued by the supreme court in the exercise of its superintending power over inferior tribunals and persons exercising judicial functions."   These observations were made with regard to a hearing under statutory provisions infinitely less favorable to the accused official than those under consideration.   They should not only be followed, but emphasized, in a case where, should an action be brought, the burden of establishing the charges to the satisfaction of a jury is by the statute thrown upon the official who makes the removal.

The question, then, is, has the ,relator been removed for sufficient cause, after a fair and legal hearing?   We are all agreed that this question must be answered in the negative ,so far as the first charge and specification are concerned.   There was here no intentional or substantial violation of the rules established by the commissioners for the government of the city prison.   The accusation was founded upon the merest technicality, and was trivial in the extreme.   The custom set up in the relator's answer to this charge was fully established.   It was always customary for the warden, in his discretion, to permit visitors to enter the prison without being searched, if, in his opinion, they were proper persons to be relieved from that formality.   This custom existed long be-

fore the relator was appointed as warden. In treating Mullin as a proper person to be relieved from search, he therefore simply exercised his discretion in good faith, quite as former wardens had done. There can be but little doubt that this discretion had been thus exercised for years with the knowledge of the commissioners, and it was so exercised without any intimation of disapproval on their part. But, even if the relator were in error with regard to his duty in this particular, there was still no just ground for removal. At the utmost, there was a mere mistake of judgment, without any accompanying element of bad faith or evil purpose. To treat such an isolated instance of honest mistake, resulting in neither public nor private injury, as incompetency, and conduct inconsistent with the warden's position, would be entirely subversive of the so-called "Veteran Statute," and of its plain intent and object. Indeed, the only effect of the conviction upon this frivolous charge is to call for careful scrutiny of the good faith of the entire proceeding, and to suggest the existence of those motives which the statute recognizes as possible, and which it so emphatically aims to check. In saying this, we do not intend to reflect upon the honorable commissioner, but we fear that he was misled by the main promoter of the proceeding. We refer to one O'Shea, who, in July, 1895, was appointed deputy warden, and who seems thereafter to have devoted himself largely to watching his superior, the warden; noting the latter's acts and doings, and getting up a case against him. It is significant that this petty charge was the sole outcome of nearly six months of O'Shea's constant surveillance. It is true that O'Shea professed to have observed and noted in writing during this period very many violations of the rules. He declared, in fact, that "the whole business" as conducted by the warden "was wrong"; and yet he was unable to particularize these violations, or furnish any other basis of accusation, his notes having, as he said, all got "into the ash pit," and been "burned up." It is impossible for any fair mind to read this man's testimony without being convinced of its malevolence and untruthfulness, nor without reaching the conclusion that this trumpery charge was put forward by him, to quote the language of the statute, "for partisan, political, personal, or other cause except incompetency and conduct inconsistent with the position" held by the relator. While acquitting the commissioner of consciously lending himself to these purposes, we cannot but regret that his vision was not clearer in penetrating them.

Our conclusion is the same as to the subsidiary specification of the second charge. The commissioner's order was that the prisoner Herman be removed from the dark cell known as the "cooler," and returned to the cell which he had previously occupied. The essential part of this order was the removal from the dark cell. There was no special significance attached to the direction to return the prisoner to his old cell. That cell had no distinctive character as distinguished from other cells of the same class. There was no intention in the commissioner's order of superseding the warden in the exercise of his general functions nor of limiting him

in the distribution of ordinary cells. So long, therefore, as Herman was not returned to the dark cell, there was no real disobedience of the commissioner's instructions. Whether the prisoner should occupy his former cell or one of the same class was a mere matter of detail. It is said that the cell (No. 9) to which Herman was transferred was cold, and not so comfortable as his former cell (No. 65). The evidence, however, shows that cell No. 9 was in the vicinity of a stove; and one of the witnesses, referring to this fact, testified that it could not have been colder than other cells. There certainly was no very marked difference in that particular between cells 9 and 65. The prisoner admitted that cell 9 contained a bed and bed covering; in that respect differing from the dark cell. In fact, it had more bed clothing than cell 65. The warden never heard of a complaint concerning the cell No. 9, and never considered it less comfortable than cell No. 65. Upon the whole, we find no trace of punishment in the removal of the prisoner to cell No. 9, and the relator's explanation upon that head is reasonable and satisfactory. He certainly cannot be fairly charged with insubordination because of a change in the location of the prisoner's ordinary cell, which, in his judgment, was, under the circumstances, desirable, and which in no wise conflicted with the substantial requirement of the commissioner. The propriety of a further continuance of discipline was within the province of the commissioner. But the responsibility for the safety of the jail and of all concerned was still upon the warden. Acting upon that responsibility, he selected another cell of an appropriate class. That was within his province. The fair paraphrase of the commissioner's order was simply that the discipline to which the prisoner had been subjected should be discontinued. That order was obeyed. The prisoner was not again placed within the environment of discipline from which he had been relieved. But, even if the relator erred in his interpretation of the order, if he should have literally —no matter how great he deemed the hazard—kept the prisoner in the one particular cell, No. 65, it was an error of judgment, and not a defiance of authority. In this connection it should be observed that the order itself was by no means precise in form or incisive in substance. It was not in writing. It was simply a telephonic communication, addressed to one Kelly, a clerk in the prison. The commissioner had no personal communication upon the subject with the relator. The latter learned of the order at second hand. Kelly tells us that the order was: "Have this man Herman—take this prisoner Herman out of the cooler—and returned to his cell immediately." Later in the day Kelly translated this message to the relator as follows: "Have prisoner Herman taken out of the cooler and returned to his cell." That none of the subordinates deemed the particular cell to which Herman was to be returned a vital part of the order is clearly evidenced by what transpired at the time. Kelly informed one of the keepers named McCaffery "that he got an order to release a man [Herman] out of the cooler"; not a word as to what was to be done with the man when released. Kelly, however, told McCaffery to take Herman back to the second tier,

McCaffery vaguely stating that he believed this referred to cell 65. Thus all the attendant .circumstances support the relator's good faith, and lend credit to his sworn statement that he did not understand that the commissioner desired Herman to be kept in the particular cell 65. The conclusion is irresistible that there was nothing in the relator's conduct with regard to this telephonic message which can justly be condemned as conduct inconsistent with his position.

This brings us to the only serious question in the case,—was the relator guilty of cruel and inhuman treatment of Herman, as charged? If he was, he was properly removed. We cannot agree with the relator's learned counsel in his contention that incompetency, in addition to conduct inconsistent with the employé's position, must be shown. It is true that the statute reads, "incompetency and conduct inconsistent," etc. We think, however, that the clear intention was to treat these phrases disjunctively. Incompetency is one thing. Conduct inconsistent with the relator's position is another. A man may be perfectly competent, and yet be guilty of some heinous conduct for which he should be removed. If, therefore, notwithstanding the relator's competency, he was guilty of what is charged in this connection, his general efficiency should not save him. The question of cruel and inhuman treatment is made up of two elements: First, the alleged keeping of Herman without food; and, second, the actual effect of this deprivation. These elements are interwoven, and cannot well be dissevered. The question is whether the prisoner suffered physically from the discipline to which he was subjected. The relator was not necessarily guilty because of the mere temporary deprivation of food. That, as the physician, Dr. Kelly, testified, in a majority of cases is a benefit, rather than an injury. The real question is whether the relator was responsible for such deprivation as was proved, and whether, if so responsible, that deprivation was actually harmful to the prisoner; whether, in other words, upon all the facts and circumstances, the treatment was cruel and inhuman. That the relator was justified in properly disciplining the prisoner we are all agreed. Even the superintendent of the workhouse, Mr. Dunphy, who was called in support of the charge, was constrained to admit—seemingly with great reluctance—that if a sane prisoner called the warden of his institution opprobrious epithets he might inflict some punishment. And in this he was clearly right. It would be destructive of all discipline and order to permit prisoners to abuse with impunity those into whose care and keeping they are intrusted. There can be no doubt that Herman misconducted himself in the hearing of other prisoners, calling relator a vile name, and using other abusive expressions. This is substantially conceded, the commissioner himself having heard the foul expression, though not the qualifying adjectives. The propriety of proper discipline to check such misconduct and prevent its extension is undoubted.

The question remains, did the discipline transgress reasonable bounds? First, did the extreme deprivation of food to which the prisoner and others testified result from the relator's orders? We

think it is apparent, upon careful analysis of the testimony, that it did not; and that the relator's orders were limited to the deprivation of meat and fish preparation, and possibly of a single meal. The only direct testimony that the relator ordered the prisoner to have no food at all is furnished by O'Shea. We have already seen that but little credit can be given to this witness. Upon the point in question, however, he is refuted by other witnesses called in support of the charges, and by the probabilities. O'Shea testified that he executed the relator's orders by instructing two keepers named Brady and Story "to bring Herman down, and take him over to the new prison, and put him in the cooler, taking ⟨ ⟩ his coat and vest and shoes." It is significant that neither of these keepers was called as a witness, and that as matter of fact Herman was not relieved of his coat, vest, and shoes. It is equally significant that O'Shea does not pretend that he said anything to Story and Brady about the more important part of the order, namely, that the prisoner was to have no food. He does say, however, that he subsequently went over to the new prison, and told Max, the keeper there, who had Herman in charge, "that the warden had said that the prisoner should get no meals." Max was examined as a witness in support of the charges, and distinctly testified that he "got no particular instructions as to feeding" the prisoner. Max's testimony here plainly conflicts with that of O'Shea. Indeed, it does more; it characterizes O'Shea's story as highly improbable. The occurrence under consideration was upon Thursday afternoon. Max testified that the very next day the relator directed him to give the prisoner no dinner, and that upon Saturday he received still further instructions as to the character and extent of the food which the prisoner was to have. All this was entirely inconsistent with O'Shea's story that the relator had given orders on Thursday that Herman should have no food at all. There is thus a complete failure of proof to establish the charge that the relator entirely deprived the prisoner of food. What he did was to limit Herman to such food as was usually furnished to prisoners under discipline in the dark cell. The only possible exception to this was the dinner of Friday. If Herman was deprived of food of that character upon other occasions, it was apparently the result of misapprehension upon the part of the keepers. Were we to assume, however, that the relator was responsible for such deprivation of food as there was, the case, so far as relates to the consequences resulting therefrom, vests almost entirely upon the testimony of Herman himself. Eliminate that testimony from the case, and it would be quite impossible to find that he had undergone treatment which was essentially cruel and inhuman. The utmost that could then be said would be that he had suffered discomfort from which, as the physician testified, the majority of people are benefited. The prisoner, however, testified that the deprivation caused him much more than discomfort. He was asked the following questions, and gave the following answers:

"Q. Did you feel any bad effects from being shut up for three days? A. Yes, I did. Q. What were they? A. At first I had nothing but a dry retching

from my stomach all night. My head ached so I thought it would bust. I laid down on the cold concrete to try and cool off my head. I thought it would bust. Q. What was your condition when you came out? A. I was as weak as I could be. I was half perished to death, and the smell of that closet was enough to kill anybody, without shutting them up in darkness, and serving them that stuff."

In addition to this, the prosecution was permitted to prove, under objection and exception, the prisoner's declaration (which was pure hearsay) that if he had been kept in the dark cell much longer he would have died. Upon cross-examination it was sought to weaken the effect of Herman's testimony in various ways: First by showing that he had previously been convicted of crime; and, second, that the suffering which he detailed resulted from pre-existing disease, and not from his prison discipline. Every effort in this direction, however, was frustrated by the rulings of the commissioner. He ruled out, under objection and exception, the question whether the prisoner had been convicted of a criminal offense before. The relator's counsel then interrogated the prisoner as to the headaches and illness which upon his direct examination he claimed had resulted from his confinement in the dark cell. Counsel endeavored to show that these headaches and this illness resulted from some prior disease. Every question upon this head was ruled out, although the counsel explained his purpose most clearly. Such questions as these, for instance, were asked and objected to:

"Q. What is the nature of the disorder you consulted the doctor about, apart from anything else you have told us? Q. Was it making you ill,—making you feel ill,—this disorder that you had? What effect did the disease have upon you that you consulted the doctor about? Q. How did it make you feel ill?"

"I submit," said the relator's counsel, "that he must answer this question. Look at the way it places my client. He complains of illness in the cell, and he has got some disease. How can the symptoms that he exhibits be attributed to his confinement unless we know what effect the disease has on him. * * * I want to know if it was his disease that would make his headache."

This was surely clear enough. The commissioner could not possibly have thereafter misunderstood the purport of the inquiry. It was followed by this still plainer question: "Q. Will you tell me what effect this disease you say you had, had on you?" Again the commissioner sustained the objection to the question, and the relator's counsel excepted to the ruling. At a later stage of the cross-examination the witness was asked whether his disorder had ever affected his appetite before. This was objected to. The following question was then put: "Q. You refuse to tell whether the other disorder had affected your appetite or not?" This was also objected to. The counsel then said to the commissioner, "You will not compel him to answer?" The commissioner replied, "No." "Then," said the counsel, "I will take an exception." It is undoubtedly the rule that in hearings of this character the same correctness and accuracy on rulings upon questions of evidence are not required as upon ordinary trials at law. But where the conclusion arrived at has plainly resulted from such erroneous rulings,

.it is impossible to sustain the finding. Such a finding is then necessarily made upon one-sided or partial facts, with all the other facts tending in the opposite direction excluded, and consequently ignored, and refused consideration. Here, then, the relator was substantially denied the right of cross-examination as to one of the most crucial parts of the accusation. It may well be, if the commissioner had permitted an adequate cross-examination upon the points as to which exceptions to his rulings were taken, that the charge of cruel and inhuman treatment would have been entirely dissipated. To secure his right on this head, relator did precisely what he was required to do by the decision in People v. McClave, 123 N. Y. 517, 25 N. E. 1047. His legal right to an adequate cross-examination was violated. Thereupon, "in order to make a ground for a reversal,"—to quote from the opinion in that case,— the attention of the commissioner was called to the error in the exclusion of the evidence "by an objection which stated the vice or illegality complained of." Although his attention was so specifically called to the error, the commissioner still adhered to his ruling, and the relator excepted. Those exceptions must clearly be sustained. It is contended that no fact which the commissioner has found depended upon Herman's testimony, and that every material fact is supported by other witnesses. As we have seen, however, this contention is inadmissible. But for Herman's testimony, we would have to lean upon the physician; and he certainly found no physical evidence of suffering or of cruelty and inhumanity. On the contrary, he made a thorough examination of the man, and found him in fairly good condition.

Our conclusion upon the whole case is: First, that as matter of fact none of the charges of incompetency and conduct inconsistent with the relator's position were sustained; and, second, that, even if the charge of cruel and inhuman treatment had been prima facie made out, it was substantial error, going to the root of the commissioner's judgment, to rule out cross-examination tending to refute such charge, and to show that the prisoner's sufferings as detailed by him, and by him alone; proceeded from causes other than the discipline to which he had been subjected.

The determination of the commissioner should be annulled, and the relator reinstated, with $50 costs and disbursements. All concur.