PEOPLE ex rel. GILON v. COLER, Comptroller, et al.

(Supreme Court, Appellate Division, First Department. January 16, 1903.)

1. MUNICIPAL OFFICERS—DISCHARGED SOLDIER—INCOMPETENCE—REMOVAL.

Under Laws 1899, c. 370, § 21, providing that no honorably discharged soldier shall be removed from a position held by appointment or employment of a city, except for incompetency or misconduct, shown after a hearing on due notice and stated charges, where the head of the bureau of collection of assessments and arrears, who was an honorably discharged soldier, permitted a subordinate from time to time for several years to collect assessments and arrears, and make all entries relating to such collections on the books, performing as to such collections the duties of the two clerks, and of the two clerks, whose work constituted a check on the cashier and on each other, thereby enabling such subordinate to collect and discharge assessments and convert the money, which he did during four or five years, and until he had embezzled $30,000, though such employé had notice of suspicious circumstances in connection with the work of such subordinate, such incompetence and misconduct were displayed on the part of such head of the bureau as justified his removal.

Hatch and Patterson, JJ., dissent.

Application for certiorari by the people, on the relation of Edward Gilon, to review the determination of Bird S. Coler, as comptroller of the city of New York, in dismissing the relator from the office of collector of assessments and arrears. Writ dismissed.

Argued before VAN BRUNT, P. J., and HATCH, PATTERSON, INGRAHAM, and LAUGHLIN, JJ.

John C. Shaw, for relator.
Terence Farley, for respondents.

INGRAHAM, J. The relator was, and for many years had been, the head of the bureau for the collection of assessments and arrears of taxes and water rents of the city of New York, and was removed on

the 31st day of December, 1901, by the then comptroller of the city of New York. The relator, being an honorably discharged soldier of the Union army during the war of the Rebellion, institutes this proceeding to review the action of the comptroller in removing him from office. He alleges in his petition that on the 24th day of December, 1901, the comptroller charged him with "incompetency, misconduct, carelessness, and gross misconduct in the affairs of the said bureau," and caused to be served upon him a notice setting forth the said charges, and specifications relating to the same, and notified the relator that the said charges would be heard and tried before him at his office on the 26th day of December, 1901, and that at a time and place an opportunity would be afforded to the relator to answer the said charges; that testimony was taken by the comptroller on the 26th, 27th, and 28th days of December, 1901, in relation to the said charges and specifications, and that the said Bird S. Coler, as such comptroller, on the 30th day of December, 1901, removed, or assumed to remove, the petitioner from his said office. One of the charges against the relator, and of which he was found guilty, was:

"That between the 1st day of January, 1898, and the 1st day of July, 1901, you permitted certain subordinates in your office, who were subject to your control and under your direction, to officiate in capacities in which they were not entitled to act, or to which they were not appointed, to wit, that you permitted one Charles P. Chipp to act as interest clerk, cashier, and recording clerk, by reason whereof opportunities were afforded to the said Chipp to misappropriate various sums of money, and which he did misappropriate, the exact amount of which is not at present ascertainable. In this connection you are accused of gross mismanagement and lack of business capacity, in not having the interest clerk and his assistants, the cashier and his assistants, and the recording clerk and his assistants, act as checks upon each other, and in not conducting your bureau in a proper, systematic manner."

The relator filed an answer to this charge, in which he does not deny that Chipp did act as interest clerk, cashier, and recording clerk, by reason whereof he misappropriated various sums of money, but in justification of this action he alleges that Chipp had been for many years an assistant collector of assessments in the bureau; that as such it was the duty of the said Chipp to look after the details of the work of the bureau; that when not engaged as recording clerk he did the work of the interest clerk and the cashier during the period when said interest clerk and cashier were absent from the office during the luncheon hour, and also during their absence from the office by reason of sickness or otherwise, and that, in order that the business of the office should be prosecuted, it became necessary, during the absence of either the recording clerk, the interest clerk, or cashier, for some one to take their places, and that there was no one in the office who was so familiar with the various duties of the different clerks and employés as the said Chipp; that the said Chipp had been in the office of the clerk of arrears for a great many years prior to the appointment of the relator as collector of assessments, and during all that period he had, so far as the relator knew or could ascertain, been a diligent and faithful clerk, and worthy of all confidence; and he denies that there was any gross mismanagement or lack of business capacity in his conduct of the department, or in his permitting the assistant collector of assessments, the said Chipp, to act as interest clerk, cashier,

or recording clerk. Upon this charge, with others, the comptroller found the relator guilty, and removed him from office.

In his return to the writ the comptroller returned the testimony taken before him. It therein appears that there was a defalcation of a large sum of the city's money by Chipp, an assistant of the relator in the bureau of which he was the head. The fact of such a defalcation by Chipp seems to have been conceded upon the hearing before the comptroller, as it was by the answer to the charges made by the relator; and that, I think, accounts for the fact that definite proof was not made as to the exact amount of the defalcation, or the exact method by which Chipp succeeded in appropriating the money of the city of New York. In examining this testimony we must bear in mind that the comptroller was examining into charges of mismanagement, carelessness, and incompetency against the head of a bureau of his department, and that both of these officers, and many of the witnesses that were examined, were employés in the department, and familiar with the method of conducting the business, and the details of the work that was done in the bureau of which the relator was the head.

The civil service law (chapter 370, Laws 1899, § 21) provides that:

"No person holding a position by appointment or employment * * * in the several cities * * * who is an honorably discharged soldier, sailor or marine, having served as such in the army or navy of the United States * * * shall be removed from such position or employment except for incompetency or misconduct shown after a hearing, upon due notice, upon stated charges and with the right to such employee or appointee to a review by a writ of certiorari."

Under this statute, as was said in the case of People v. Nichols, 79 N. Y. 588, which has been made applicable to a proceeding under this act in the case of People v. Wright, 7 App. Div. 185, 40 N. Y. Supp. 285, affirmed by the court of appeals in 150 N. Y. 444, 44 N. E. 1036:

"The proceeding must be instituted upon specific charges, sufficient in their nature to warrant the removal, and then, unless admitted, be proven to be true. * * * It follows, therefore, that the proceeding is juridical in its character."

And Mr. Justice Barrett, in citing this, says:

"These observations should not only be followed, but emphasized, in a case where, should an action be brought, the burden of establishing the charges to the satisfaction of a jury is by the statute thrown upon the official who makes the removal. The question then is, has the relator been removed for sufficient cause, after a fair and legal hearing?"

In considering the sufficiency of the charge against the relator, and the proof to sustain it, it is proper to consider the nature of the duties imposed upon the relator and the comptroller, and the nature of the specific charge. Upon the department of finance of the city of New York, the head of which is the comptroller, is imposed the duty of receiving and paying out each year an enormous amount of money, aggregating upwards of $100,000,000. Various bureaus in the department are charged, some with the receipt, and others with the disbursing, of this money; and, to insure an honest and faithful discharge of these duties, it is certainly essential that the head of the department should have a large discretion in the appointment or removal of

the heads of the various bureaus, upon whom he must in a large measure depend in protecting the city. If a defalcation takes place in one of the bureaus of this department, at the head of which is an officer having charge of the bureau, and controlling the subordinate officers who are there to perform the duties of the bureau, it is most essential that the head of a bureau receiving and paying out money should be held responsible for the imposition of such checks as will prevent the subordinates from stealing the city's money. There seems to be no question but that the relator, in charge of this bureau, had the control and the management of his office and the subordinates of the bureau; and it was his duty to establish a system under which a defalcation could not go on for a long period of time without detection. It may be that, with the utmost care and attention on the part of the head of a bureau of this character, a defalcation cannot be prevented; but, where the attention of the head of the bureau has been called to the fact that the system established was such that it was possible for an employé to appropriate the money of the city, it was the duty of the head of the bureau to see to it that the system was changed and the necessary checks imposed.

We have in this case the conceded fact that an assistant collector of taxes and assessments in the relator's bureau had for years been allowed to steal from the city a large sum of money. The deputy collector in this bureau testified that between January 1, 1894, and December 30 or 31, 1900, payments were credited upon the tax rolls of the bureau, in the sum of over $30,000, which had no corresponding entry in the cash books, to indicate that the money ever went to the credit of the city, and this evidence was not denied. We start, therefore, with the conceded fact that in this bureau there had been, during the period the relator was at the head of it, a defalcation of over $30,000, and that it appeared upon the books of the bureau over which the relator had control, in the entries made by one subordinate, that payments were credited upon the tax rolls in this sum of $30,000 which had no corresponding entries in the cash books to indicate that the money ever went into the treasury of the city. It seems, also, to have been conceded that the person responsible for this defalcation was one Charles P. Chipp, who occupied the position of assistant collector of assessments and clerk of arrears. In such an office as this, it is apparent that if the same officer was allowed to make out the tax bills, and make the entry in the book which discharged the property from the lien of the tax or assessment, and also acted at the same time as the officer who received the money, and made the entries in the cash books in which was entered the money received, an opportunity was afforded that officer to enter a tax as paid in the tax books, thus discharging the property from the lien, make no entry of money received in the cash books, and appropriate the money paid. The defalcation, then, could only be discovered by a comparison of the book containing the entry that discharged the lien of the tax or assessment, and the cash book, which contained the entries of the money that had been paid to the city. To allow in such an office the same person to have charge of all these departments, making the entries in both of these books, and receiving the money, would be a failure of the head of

the bureau to observe and enforce the rules which were necessary to protect the city.   There is no claim but that there was a sufficient number of employés in this bureau to provide a separate clerk for each of these departments, and a separate cashier to receive the money.   It was proved by the same witness that since his appointment, on March 16, 1898, he had observed Chipp, the defaulter, acting as interest clerk, entering the tax bills on the cash sheet during the lunch hour, and, in the absence of the cashier, receiving the cash at the window, and posting the amounts received.   The witness testified that he had called the relator's attention to this condition, and received a reply that he would see Chipp, and stop it; that, notwithstanding this notice, Chipp continued to receive the money and make entries in regard to it; that witness attempted to stop it, and told Chipp that he must not do it; and that Chipp's reply was that he was helping out Mott, the recording clerk, who was behind in his work.   The witness further testified, "I told him if Mott was behind in his work I would get him an assistant to help him out;" that Chipp acted in the capacity of interest clerk, cashier, and recording clerk almost daily; that the system in vogue in the office, by which the interest clerk, cashier, or receiving clerk acted as a check upon each other, was that they were different persons; that the cashier was there to take the money that came into the office after the interest had been added on the tax bills, and he entered it·in a cash book he had for this purpose, and then it was expected that a different person would do the posting; that the attention of the relator was called to the fact that Chipp was doing the business of recording clerk, but, notwithstanding the fact that the relator's attention was called to this, he made no efforts, so far as appears, to change the system.

The bookkeeper of the bureau also testified that Chipp frequently computed interest, and also received cash and receipted bills during the absence of the cashier or the interest clerk; that he also acted as cashier while the cashier was present at the office, on an average of once or twice a week, and perhaps oftener; that he had seen the relator present when Chipp was acting as cashier, when the cashier and assistant cashier were both present.   And this was corroborated by other testimony as to the method by which Chipp was enabled to steal this large sum of money from the city.   Keleher, the deputy collector, also testified that he had told the relator that, on every occasion that he had to take his key out and open the case where the cash books were, Chipp, for some reason or other, was around the witness; that "he would turn over an old record or something, to see what I was doing."   And the witness then told the relator that he (Chipp) should stop posting, and that he need form a collusion with no one to commit a fraud, to which the relator replied that he would see Chipp about it; that subsequently he noticed Chipp doing the same thing.

Here we have direct evidence of the fact that the relator was told of the suspicion which the action of Chipp had aroused in the mind of his assistant; told that he was receiving the money, and also posting the payment, which would enable him, without collusion with any one, to steal the money received; that he had acted in a suspicious way whenever the witness had gone to the cash book, as though he wished

to know what the witness was doing with the cash book; and yet no precaution was taken and nothing was done to stop a custom which the relator was expressly informed of by his subordinate, and enabled Chipp to do just what he did,—rob the city. It seems to me that this was ample evidence to sustain the finding that the relator was guilty of such careless conduct in the discharge of his duty as the head of this bureau as justified the comptroller in removing him. The city had been robbed of a large amount of money, which was rendered possible by the fact that a subordinate in the relator's office had been allowed to act both as cashier and bookkeeper, to receive the money, and make all the entries in relation to its receipt. Of this the relator had notice, and, although the head of the bureau, with power to prescribe the duties of his subordinates and to enforce the necessary checks and regulations, he took no precautions to protect the city. If there is to be any responsibility for the proper conduct and management of a city office, involving, as this did, the receipt of large sums of money, and if the city is to be protected from defalcations of this character, the heads of the bureaus who have charge of the receipt of the money on behalf of the city must certainly be held responsible both for their own acts and for the acts of their subordinates; and to say that the comptroller of the city of New York cannot remove a subordinate in his department, whether the head of a bureau or not, who, by carelessness and the refusal to adopt the ordinary business precautions, after his attention has been called to the situation, allows the city to be robbed, would seem to me to take away the one safeguard necessary to protect the public's money. From the conceded facts and the testimony of these witnesses to which attention has been called, I think the comptroller was justified in saying that an officer in charge of a bureau who had acted as it was shown the relator had acted was guilty of such misconduct and carelessness in the discharge of his duties as would make it unsafe to continue him in that position, and for that reason I think the action of the comptroller should be affirmed.

I think the record shows that the relator had a fair trial. He was allowed to cross-examine the witnesses produced to sustain the charges, to call all the witnesses he desired to call, to make a full statement to the comptroller in his defense, and he was represented by counsel; and upon this whole record it seems to me that there was ample proof to sustain the charge of carelessness by the relator in the performance of the duties of his office, which justified the comptroller in refusing longer to keep him in this responsible position, where the greatest care and attention was necessary to protect the city.

The proceeding should be affirmed, and the writ dismissed, with costs.

VAN BRUNT, P. J., and LAUGHLIN, J., concur.

The writ of certiorari was granted on the 31st day of February, 1902, on the petition of the relator, which showed that the relator was a citizen of the United States, and a resident of the borough of Manhattan, in the city of New York; that on the 13th day of February, 1894, he was appointed by the comptroller as collector of assessments and clerk of arrears; that thereafter

the title of said office was changed by law, so that relator's official title was known as "Collector of Assessments and Arrears"; that the relator is an honorably discharged soldier of the Union army in the war of the Rebellion; that he also served the term required by law in the volunteer fire department of the city of New York; that Bird S. Coler was comptroller of the city of New York from the 1st day of January, 1898, until the 31st day of December, 1901; that on the 30th day of December, 1901, the said Coler, as comptroller, did illegally, irregularly, and without cause remove the relator from his said office of collector of assessments and arrears. Charges were preferred by the comptroller against the relator, a trial was had before the comptroller upon specifications served upon the relator with such charges, and after a hearing thereon the relator was removed from his office. There were ten distinct charges, with specifications, preferred against the relator, the first six of which charged that, in violation of his duties, he had failed and neglected to immediately give public notice by advertisement of the confirmation of the assessment for regulating, grading, curbing, flagging, fixing, and repairing sewers and paving of certain streets therein specified. The remaining charges were as follows: "(7) That between the 1st day of January, 1898, and the 1st day of July, 1901, you permitted certain subordinates in your office, who were subject to your control and under your direction, to officiate in capacities in which they were not entitled to act or to which they were not appointed, to wit, that you permitted one Charles P. Chipp° to act as interest clerk, cashier, and recording clerk, by reason whereof opportunities were afforded to the said Chipp to misappropriate various sums of money, and which he did misappropriate, the exact amount of which is not at present ascertainable. In this connection, you are accused of gross mismanagement and lack of business capacity, in not having the interest clerk and his assistants, the cashier and his assistants, and the recording clerk and his assistants, act as checks upon each other, and in not conducting your bureau in a proper, systematic manner. (8) That between the 1st day of January, 1898, and the 1st day of July, 1901, you failed and neglected to take proper care of the tax rolls and assessments records, which contained the only records of the arrears due the city, in that you omitted to see that at the end of each day the clerks in charge of said records, instead of leaving them in the desks, where they could be handled and tampered with or injured, put them in fireproof safes, or safes which were provided for that purpose, or in some secure place. (9) That between the 1st day of January, 1898, and the 1st day of July, 1901, you failed and neglected to exercise proper care or take any precautions with regard to the accuracy and correctness of the books and records of your bureau intrusted to your charge and under your control, in that you omitted to examine them, or examine them with that degree of care necessary to ascertain that discrepancies existed, and that such discrepancies were the result of peculations and misappropriations of your subordinates. (10) That during the month of September, 1900, without instructions from the comptroller or his deputies to that effect, and in violation of the orders of your superiors, you assumed to countermand a requisition made by the comptroller on the commissioner of public buildings, lighting, and supplies for various improvements in the bureau of the clerk of arrears."

HATCH, J., after stating the facts as above (dissenting). The position held by the relator was not confidential in character. Consequently he was not subject to arbitrary removal by the comptroller. People v. Dalton, 41 App. Div. 458, 58 N. Y. Supp. 929, affirmed on appeal in 160 N. Y. 686, 55 N. E. 1099. In the above case, on a former appeal (158 N. Y. 204, 52 N. E. 1119), it was held that the determination as to whether a given position is one of trust and confidence, and therefore confidential, is largely governed by the provisions of the statute which define the particular duties and limits the power and authority between the head of an office, selected by the people, and a deputy official in charge of a particular bureau. The rule, in substance, which governs such right, is made to rest upon the considera-

tion as to whether the head of the office is financially responsible for the errors or misconduct of the subordinate, or is under official bonds to answer for his neglect of duty respecting the custody of public moneys or securities which come into his hands in such capacity. It does not appear in the present record, nor are we aware of any provision of law which makes the comptroller liable for any loss which the city might sustain by reason of the failure of the relator to properly perform the duties of his office; nor is it claimed by the respondent that any such liability attached to the comptroller ·by virtue of his office; nor was he required to give any official bond for the proper discharge by the relator of his duties. In addition to this, the theory upon which the comptroller proceeded in preferring charges, and conducting a trial thereon, is opposed to any such claim; nor did the legal adviser who conducted the prosecution suggest that any such right existed in the comptroller to· arbitrarily remove the relator on account of holding a confidential position. Having adopted this particular course, and proceeded upon the theory that he could only be removed upon charges, sustained by proof, it is doubtful if he can now be heard to raise such question for the first time upon this appeal. People v. Wright, 150 N. Y. 444, 44 N. E. 1036. But independent of this question, we are of opinion that the relator was protected in his office by the veteran statutes, that the confidential relation did not exist which authorized his arbitrary removal by the comptroller, and that he could only be removed upon charges after a trial and hearing.

The various acts which have been passed, designed to secure to the relator, as an honorably discharged soldier of the Civil War, the permanency of his tenure in the position which he holds, and the legislative history concerning the same, are elaborately reviewed in People v. Wright, 7 App. Div. 185, 40 N. Y. Supp. 285, wherein it was held "that the legislation of the state had steadily and consistently protected veterans, providing that they should not be removed from public positions except for incompetency and conduct inconsistent with the positions held by them, and that the burden of proving such incompetency and inconsistent conduct was by statute imposed upon their accuser." The decision therein made was affirmed upon appeal. 150 N. Y. 444, 44 N. E. 1036. The court, in review of the question presented by this writ, has authority to examine and pass upon all questions of law and fact which are disclosed by the record, and where the evidence in proof of the charges is not of a substantial character, which the law requires, a conviction based thereon will be set aside. People v. Welles, 5 App. Div. 523, 39 N. Y. Supp. 50; Code Civ. Proc. § 2140.

The first six charges relate to the same subject-matter, and the dereliction of duty charged therein is the neglect to immediately give public notice, by advertising, of the confirmation of the various assessments specified in the charges. It appeared without dispute that, during the period covered by the charges and specifications relating to this matter, there were upwards of 1,425 assessment lists which were confirmed, and which passed through the relator's hands. Each list contained, on an average, about 150 items, and each one of these items required a separate notice and advertisement. It appeared by the

proof that the course of business in the comptroller's office with respect to these lists was that, immediately after the confirmation of the same by the board of revision of assessments, they were sent to the bureau for the collection of assessments and arrears (relator's bureau), and therein entered in the records of the titles of assessments confirmed, as kept in such bureau, in order to perfect the lien of the assessment. After this was done they were returned to the chief clerk of the board of revision and assessments, who attached thereto a certificate of the confirmation of the several lists, when they were sent to the bookkeepers for entry in their records. An analysis of the assessments was then made, showing the amount of the contract, expenses for surveying, interest, etc., and, when charged up, was transmitted to the clerk of the bureau of assessments for collection. Arriving in this bureau, the relator then makes up the notice and publishes the advertisement. This system has prevailed in the office for upwards of 40 years,—and no other system had obtained during the period of relator's service and prior thereto,—and was the system which was in vogue during the period covered by the charges and specifications. In 1893 the law with respect to advertising notices of assessments was changed, by requiring that the area of assessments affected by the several lists should also be published in the notice. This requirement imposed additional burdens in making up the notice and advertising. The statute governing the publication of the notice required that it should be published immediately. It is evident that such requirement was relative, as literal compliance could not be had with its terms. It would be an impossibility, as some time must elapse between the confirmation and the publication of the notice. This court held, in construction of such statute, that a reasonable time was contemplated thereby. In re Hatch, 74 App. Div. 248, 77 N. Y. Supp. 605. It is evident that, if the relator fairly complied with the statute in this regard, it would not furnish a basis upon which to found incompetency or dereliction in the performance of duty, if he published within a reasonable time the notices required by law. It appeared that prior to 1894 the duty of preparing and publishing these notices had been devolved upon one Levien, a clerk in the office. He died shortly after the law of 1893 took effect, and thereafter the duty of preparing the notices and publishing the same was devolved upon the relator. In the preparation of these notices, no facilities were furnished for doing it rapidly. Each one was required to be written out in longhand with a pen, and this required a considerable time. In the letter to the relator transmitting the assessments covered by the charges and specifications, it appears that the first and second aggregated 106 assessments; the third, 88; the fourth, 14; the fifth, 107; and the sixth, 82. As to these several lists, from the date of the transmission by the deputy comptroller to the date of the publication of the notices, including Sundays and holidays, 20 days intervened as to those covered in the first two specifications; under the third specification, 12 days; the fourth, 6 days; the fifth, 10 days; and the sixth, 13 days. It is to be borne in mind that between 1894 and 1897, the period covered by the charges, there were 1,425 lists confirmed, with an average of 150 items. It is fair to assume, therefore, that only these items con-

tained in the charges preferred by the comptroller against the relator could be found, in which there had been any neglect of duty. It is fair, also, to assume that the lists were examined by the comptroller, and that such examination disclosed that, out of this immense volume of business, only four instances could be found in which the relator had been guilty of any dereliction whatever. Instead, therefore, of the testimony proving incompetency and dereliction of duty in respect to these charges, we are of the opinion that the omissions to publish some notices promptly might easily happen in the most careful and painstaking management of the office; and, if no more than these could be discovered,—and we are bound to assume that they could not,—instead of establishing incompetency and neglect it furnishes evidence of faithful and conscientious discharge of duty. It is well known that infirmity attends upon human endeavor in every branch of service to which it is applied, and that mistakes and omissions, under the most careful management, creep in. The effort always is to reduce errors to the minimum, and this record seems to establish that, as to these charges, the relator had succeeded in a marked degree, when the volume of business is compared with the number of omissions which are established. We therefore think that the proof was insufficient upon which to found a judgment of incompetency and neglect under these charges and specifications.

The seventh and ninth charges, in substance, relate to the same matter, and may be considered together. The first of these charges misconduct in allowing one Charles P. Chipp to act as interest clerk, cashier, and recording clerk, whereby opportunities were afforded to misappropriate various sums of money by Chipp, and that he did misappropriate moneys of the city, the exact amount of which was not then ascertainable; the ninth, that the relator omitted to take proper care and precaution with regard to the accuracy and correctness of the books of records of the bureau intrusted to his charge, and to ascertain that discrepancies existed therein. The charges embraced in these specifications present, in our judgment, the only serious question in the case.

Prior to the relator's appointment, one McDaniel was in charge of this bureau. Chipp had been under McDaniel for a time prior thereto, the length of which does not appear, as assistant collector in the bureau. Upon the death of McDaniel, Chipp took charge of the bureau, and acted as the head of it. The relator was appointed on the 13th day of February, 1894, and when he entered upon the discharge of its duties he succeeded Chipp therein; and the latter thereafter, during the whole period of the relator's administration, continued to hold the position and perform duties as assistant collector of assessments, stood therein next in point of authority to the relator, and was superior in authority in such position to the other clerks and employés of the bureau. The duties devolved upon him in such position required that he should look after the working force of the office. The evidence to substantiate this charge, in the main, came from the witness John Keleher, a deputy in the bureau. He testified that he spoke to the relator about improving the system of bookkeeping. This was not embraced within any of the charges or specifications; but it appears

that, after consolidation of the boroughs of the city of the Greater New York, a new system in this department was devised by the relator and was adopted. Under the system, as it formerly existed, the witness stated that anybody could cancel a lien by writing the date subsequent to the 1st of June in the tax books of the year that the money was returned to the deputy collector of assessments and arrears for the collection of the money, and that it could not thereafter be detected, as no balance of the books was ever taken; that in 1898 he observed Chipp entering the tax bills on the cash sheets during the lunch hour, or, in the absence of the cashier on any occasion, he would receive the cash at the window; and the witness afterwards observed him going and doing his own posting. He says:

"I called his attention to the fact, and I called the colonel's [relator's] attention to it. Q. What did the colonel say? A. Well, he said he would see Charley, and stop it. That was Mr. Chipp, probably. And subsequent to that time I found Mr. Chipp posting again, and I stopped it. I told him I thought it was wrong, and he must not do it. He said he was helping Mott, the regular cashier, who was behind in his work. Well, I told him if Mott was behind in his work I would get him an assistant to help him out; and, that, in my judgment, was the reason why there was so small a defalcation in 1898."

This witness further stated that he observed this almost daily during the absence of the regular assistant cashier at his lunch, but not in the presence of Col. Gilon, and that this continued until the appointment of an assistant cashier, after he was sufficiently qualified to serve, and that even during his appointment he frequently acted as cashier; that the system in vogue kept the interest clerk, cashier, and recording clerk separately employed, and their work acted in all instances as a check upon each other. There was some other testimony showing that Chipp did these acts during the time that the several clerks performing the several duties were at lunch. It did not appear, however, that they all went to lunch at the same time. On the contrary, the proof is that they did not. We assume, however, this proof shows that at some of the times Chipp acted in these several capacities. The relator denied that he had any such conversation with the witness Keleher, as testified to by him, with respect to Chipp acting in these capacities at the time it happened, or about that time, and that he was never informed with respect to such subject by Keleher until after the defalcation had been discovered. It appeared from the books themselves, which were produced upon the trial, that they contained a large number of entries in the handwriting of Chipp; and it also appeared that, when entries were made in the books, money could not be misappropriated without detection, so that no money could be taken by Chipp in this manner unless he failed to make the proper entries, and that he so failed to make such entries is nowhere disclosed in this case. The amount which Chipp misappropriated is not known, when he appropriated it is not established, how he appropriated it no witness explains, and the only way it can be arrived at is by inference, which may or may not be true. During the period covering the time when it is claimed that Chipp was guilty of peculation, the books were twice examined by expert accountants. Upon the first examination, nothing wrong was discovered; nor does it appear, except perhaps by in-

ference, that the second examination disclosed anything wrong. None of the experts who examined the books were called as witnesses upon the hearing before the comptroller, and no testimony was given as to what they did, or how the defalcation was covered up, or what the methods were by which it was accomplished. The only thing which appears in this record upon that subject is that in February, 1901, a defalcation was discovered. It would seem that if the misappropriation of the money arose by reason of Chipp acting for the clerks, or in their places, during the lunch hour, it would have been established by proof. Keleher's testimony does not establish it, and no other clerk is called to show how it was done, or how it might have been done. It is said that it may be inferred that Chipp was enabled to misappropriate money by signing the tax receipts and delivering them to the taxpayer, keeping the money so paid, and making no entry whatever in the books, or making the entry subsequent to the 1st of June in the tax books of the year that the money was returned to the collector of assessments and arrears for collection. If entered in the books or taken from the drawer after entry, the peculations would be immediately disclosed. A false entry in the books would work a like result. If Chipp took the money, and receipted the bill, and appropriated it to his own use, such fact is not made to appear from the mouth of a single witness connected with the office, having charge of the books or otherwise. Nor does it appear that any tax receipt was ever issued by Chipp to a taxpayer where the tax was not canceled. Nor is there an instance specified where a tax receipt was given, and the tax canceled, that it did not appear in the books. There may be advanced, perhaps, a number of theories which would account for the abstraction of the money, but there is nothing contained in this record wherein it is made to appear by the mouth of any witness how Chipp took the money, which it is charged the relator should have prevented; and in the absence of any proof upon that subject, showing how the money was abstracted, it is difficult to see how the relator could have prevented it, or what steps he ought to have taken in the premises. Keleher gratuitously states that his act in stopping Chipp, in his judgment, reduced the defalcation for the year 1898. The statement was wholly gratuitous, and was stricken out by the comptroller, although it appears in the present record; but even he does not enlighten us upon the subject of how Chipp took the money. While the relator was still in office, and on July 17, 1900, the comptroller appointed Edward A. Slattery as deputy collector, to take charge of the affairs of the office in general. It is evident from the testimony appearing in the case that he was extremely hostile to the relator, and that, by the direction of the comptroller, he, for all practical purposes, superseded the relator in the performance of the duties of the office. This appointment of Slattery to discharge the duties of that office, and rank as superior to the relator, was without authority of law. It is evident that after Slattery's appointment he used every means in his power to expose some misconduct or incompetency upon the part of the relator. He assumed to give directions with respect to the change of the offices and otherwise; but while he was so acting Chipp remained, and his methods of peculation, whatever they were, continued undisturbed.

until February, 1901. If the relator was derelict, Slattery would seem to have been, also. Towards the latter end of Chipp's service, McGinley, a clerk in the office, communicated some suspicion of Chipp to Slattery. He had carefully concealed the same from everybody else, and it was some time after that before any discovery was made.

It is fair, in connection with these charges and the proof bearing thereon, to consider the relation which Chipp occupied to and in the office. It is established that he had general charge of the working force; that, in the discharge of the duties which were devolved upon him, he had the right to go to every clerk in the office, and into his place of employment, to oversee the work, and exercise general supervision in the absence of the relator. He was a trusted employé, had been there for a great many years, was found in the office and retained by the relator when he entered upon the discharge of his duties, and the method and manner in which he discharged the duty devolved upon him had been to the satisfaction of everybody connected with the office for a long period of years. Nobody suspected him of wrongdoing until a short time prior to a discovery of his misdeeds. He had acquired the reputation of a faithful, trustworthy employé, and as such the head of the bureau had every reason to rely upon him. His reputation in this regard was established when the relator was appointed, and the existence of such a reputation warranted the relator in giving him his implicit confidence. The present case is none other or different than that which is found in private financial institutions, where confidence has been betrayed, and a trusted employé turns out to be a thief. It has never happened, so far as we are aware, that the head of such an establishment, having no reason to suspect the offender, has been charged either with dereliction of duty or incompetence in the management of its affairs, in failing to discover and expose the peculations of an employé who by a long course of apparent upright conduct has established for himself a reputation of probity and faithfulness, which has resulted in reposing in him implicit confidence by the officer in charge. Nobody has thought, so far as we are aware, that under such circumstances the head of a bureau should respond financially for the amount of the defalcation, or should lose his position, because his confidence has been betrayed. Giving full force and effect to everything which the proof establishes in this case, it fails to show such a state of facts as warranted the charge either of misconduct or incompetency upon the part of the relator in failing to discover Chipp's defalcation, and promptly dismissing him. We are quite willing to concede that ingenuity may spell out a theory of how Chipp's defalcation could be discovered, and how he was enabled to make his misappropriations, but it will remain the fact that such theory may or may not be true. It is enough now to say that it is not proved how he misappropriated the funds, or how the relator should have discovered and corrected it. Consequently there was not a sufficient basis upon which to find the relator guilty of an offense in this regard. The law requires that the offense shall be proved by something stronger than theoretical speculations.

The eighth charge relates to failure upon the part of the relator to take proper care of the tax rolls and assessment records, and for

failure to place them in a safe at night. It is enough to say in respect to these charges that it has not been made to appear that a single book, record, or other paper has been either lost or destroyed on account thereof. The record is in a somewhat confused state regarding this subject. The tax rolls themselves, so far as we are able to gather from the record, which constitute the original record of the assessments, were kept in cases, and such cases were furnished by the city, and they were the only receptacles for them. Surely the relator could not be called upon to exercise greater care with respect to their control and custody than such as the city authorities deemed prudent to furnish. There is no evidence in the case showing that these rolls were not at all times kept in the receptacle which was furnished for them. It was said that the assessment books, the original entry from these rolls, should have been placed in the safe. Confessedly, for a long time there was no safe sufficiently large to hold them, and the safe that was furnished seemed to be insufficient in that respect. The books themselves were mainly kept in racks or upon the desks. They were used by the numerous clerks in the office, by the searchers from the title and guaranty companies, and by other persons. The right to search by the title and guaranty companies and to use the books, the comptroller was requested to admit he had given, and answered that he declined to admit anything. It is plainly evident that all of these books could not be kept in the safe which was furnished, and it seems that the owner of the building was apprehensive that it was not sufficiently strong to support the safe which was put in. Testimony is given by Mr. Slattery that certain books and papers were scattered upon the floor, and tobacco juice expectorated over them. It would have corroborated the testimony of this witness if the books or papers showing the tobacco stains had been produced. This was an easy matter, and would place the fact beyond peradventure. No other witness makes mention of such matter, and the circumstances did not warrant that it receive credence. The books and papers were kept in the room which was provided for that purpose, and for their safety while there the relator was alone responsible. Until it be made clearly to appear that a safer place had been provided for their reception, no misconduct can be attributed to the relator, based thereon; and, inasmuch as it does not appear, during the long period of time in which these books and papers had been kept in this room in the respective places where they were used, that any loss or damage was sustained, we think it entirely insufficient upon which to base a charge of incompetency or misconduct.

The tenth charge is puerile. There was no proof of any violation of any order of the superiors in authority by the relator. Slattery was not his superior and could not be made such by act of the comptroller, so long as the relator remained in his position and was entitled to perform its duties. But even the clash with Slattery was not established, although the latter was quite willing to make it so appear. The only basis upon which it can rest was the failure of the relator to permit some changes to be made in the rooms by the men sent to perform the work. The deputy comptroller testified that he had no conversation with the relator upon the subject. He was the officer who

sent the workmen, and it appeared that, as the relator had not been informed of any proposed changes, when the workmen came he sent them away. This charge is too puerile to call for discussion.

For these reasons, therefore, the proceeding should be annulled, and the relator reinstated in his office, with $50 costs and disbursements.

PATTERSON, J., concurs.